**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| **DANIEL JOSEPH TOUIZER,**<br><br>***Petitioner*,**<br><br>**vs.**<br><br>**WILLIAM BARR, in his official capacity as Attorney General of the United States, MICHAEL CARVAJAL, in his official capacity as Director of the Bureau of Prisons, and PATRICIA MIKULAN, in her official capacity as Executive Director of the Salvation Army Residential Reentry Program,**<br><br>***Respondents.*** | **Case No.** ______________<br><br>**Judge** ________________ |

**VERIFIED PETITION FOR WRIT OF**
***HABEAS CORPUS* PURSUANT TO 18 U.S.C. § 2241**
**AND SUPPORTING MEMORANDUM OF LAW**

Petitioner Daniel Joseph Touizer, by and through the undersigned counsel, alleges, based on personal knowledge as to himself and his own circumstances and on information and belief as to all other matters, as follows:

**PRELIMINARY STATEMENT**

1. On May 22, 2020, the Bureau of Prisons ("BOP") released Petitioner Daniel J. Touizer ("Mr. Touizer" or "Petitioner") to home confinement based on its determination that he was at a heightened risk of sickness and death from SARS-CoV-2, the highly contagious respiratory syndrome coronavirus that has deeply impacted and continues to affect every aspect of life as we know it ("COVID-19"). BOP's decision was made, in part, because, in January 2020, Mr. Touizer was rushed from his prison bunk to the hospital with serious respiratory issues that rendered him substantially unable to breathe. Mr. Touizer still suffers from chronic dyspnea since his release from the hospital and he continues to be at an increased risk of severe or life-threatening consequences if he contracts COVID-19.

2. In late October and early November 2020, after spending approximately four months in home confinement, representatives at the Salvation Army Residential Reentry Program in West Palm Beach, Florida (hereinafter sometimes "Residential Reentry Program," "Salvation Army" or "Halfway House"), advised Mr. Touizer for the first time that he was no longer permitted to speak with victims in his underlying criminal action until further notice.

3. Respondent Mikulan later emailed a document to Mr. Touizer which he was to sign and return. The document Respondents attempted to foist on Mr. Touizer, in substantial part, mirrored the conditions of supervised in the Court's Judgement with one exception: It added a condition prohibiting him from communicating with any of the victims of his offense. Mr. Touizer was never served with an incident report or any written reasons for the new restriction. When Mr. Touizer communicated that he had questions about the communication restriction, he was asked to appear at the Salvation Army for a "meeting" on November 10, 2020. Mr. Touizer complied. The "meeting," however, was actually a "hearing," and Mr. Touizer was pressured to agree to waive his right to at least 24-hour notice prior to a hearing. Mr. Touizer was arrested while still present at the Halfway House and remanded to prison for purportedly failing to sign the document, which required him to acknowledge that he is prohibited from communicating with the victims of his offense. BOP disregarded its own rules and procedures as to both the communication restriction and remand to prison, including by never serving Mr. Touizer with any incident report.

3. In sum, BOP (i) did not provide answers to any of Mr. Touizer's questions; (ii) did not provide an opportunity to those parties not in BOP custody whose First Amendment rights would also be impacted by the document to be heard; (iii) did not provide reasonable notice for Mr. Touizer to arrange for witnesses to be called; (iv) did not provide a basis for the

communication restriction that would constitute a valid, rational connection to a legitimate penological interest; (v) did not provide any information of any purported complainants; (vi) coerced an unenforceable waiver of BOP's notice requirement; and (vii) otherwise failed to comply with the provisions of its Inmate Discipline Program, 28 C.F.R. § 540.15 and/or basic procedural safeguards set forth in *Wolff v. McDonnell*, 418 U.S. 539, 94 S. Ct. 2963 (1974). Rather, BOP proceeded against Mr. Touizer on the basis that he failed to "promptly" execute the newly minted document acknowledging the communication restriction, immediately revoked Mr. Touizer's home confinement, and placed him into custody because of the alleged refusal to sign it.

4. Respondents' actions violate the First Amendment right of a prisoner to communicate with the outside world as well as the First Amendment right of those parties who engaged in the communications. Their actions further violate the right to due process under the Fifth Amendment, and the right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution. Furthermore, the BOP's revocation of Mr. Touizer's home confinement was a retaliation against him for inquiring into Respondents' extraordinary demand to impose a communication restriction that is inconsistent with the provisions of this Court's judgment in the underlying criminal action, is inconsistent with BOP policy, and (as set forth herein) is inconsistent with binding and controlling authorities. This

Court should, therefore, order Mr. Touizer's immediate release to home confinement.

**THE PARTIES**

6. Petitioner Daniel Touizer is a 47-year-old man currently imprisoned in the custody of the BOP at FDC-Miami.

7. Respondent William Barr is the Attorney General of the United States and is being sued in his official capacity. As Attorney General, Respondent Barr is the head of the U.S. Department of Justice and the chief law enforcement officer of the Federal Government, and he is responsible for oversight of the BOP.

8. Respondent Michael Carvajal is the Director of the BOP and is being sued in his official capacity. As Director of the BOP, Respondent Carvajal is responsible for oversight and management of federal prisoners housed in federal prisons and county jails.

10. Respondent Patricia Mikulan is the Director of the Salvation Army Residential Reentry Program in West Palm Beach, Florida, and is being sued in her official capacity. As an agent for BOP, Respondent Mikulan was responsible for oversight of Mr. Touizer's home confinement.

**JURISDICTION AND VENUE**

11. Petitioner brings this action pursuant to 28 U.S.C. § 2241 for relief from unlawful detention that violates his First, Fifth and Eighth Amendment rights.

12. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 2241 (*habeas corpus*), 28 U.S.C. § 1651 (All Writs Act), Article I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause), and 28 U.S.C. § 1331 (federal question).

13. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 2241(d) because Petitioner is in custody in this judicial district and venue. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to these claims occurred in this district.

## I. STATEMENT OF FACTS

### A. Release to Home Confinement to Assure Mr. Touizer's Safety

14. On July 24, 2018, Mr. Touizer was sentenced to 68 months imprisonment following his guilty plea to conspiracy to commit mail and wire fraud under 18 U.S.C. § 1349. Mr. Touizer was continuously incarcerated at the FCI Miami Satellite Camp from September 20, 2017 through on May 22, 2020.

15. A lung condition manifested itself in Mr. Touizer in January 2020, in the middle of the night, when Mr. Touizer was admitted to Jackson Memorial Emergency Room with serious respiratory issues. Following his hospitalization, Mr. Touizer continued, and continues, to experience shortness of breath.

16. On May 22, 2020, based upon BOP's determination that Mr. Touizer was at serious risk of sickness and death from COVID-19 if he remained in custody, BOP released Mr. Touizer to spend the remainder of his sentence in home confinement pursuant to the CARES Act and the directives of Respondent Barr.

**B. The Pending Civil Litigation**

17. Mr. Touizer is a party defendant in various pending civil litigation matters involving disputes with an individual, James Lockhart, hired by Mr. Touizer and various investors to replace Mr. Touizer as general partner in real estate projects during his incarceration in connection with certain entities known as the "Wheat entities." In these pending actions, Mr. Touizer is attempting to prevent himself and about 50 similarly situated investors from being squeezed-out and divested of substantial contractual ownership interests by another partner. Mr. Touizer, with his lawyer's approval, has had limited interaction with various similarly situated investors, who have steadfastly sought out his assistance.

18. Notably, during Mr. Touizer incarceration at Miami FCI, he was in communication with various of the investors or victims and the prison Warden even arranged for his deposition to take place there. No BOP official ever complained about Mr. Touizer's defense activities during his incarceration. Nor did the BOP attempt impose a restriction on those activities and communications.

19. The BOP, however, after Mr. Touizer had been on home confinement, suddenly attempted to stop Mr. Touizer from working with, or communicating with, the investors in the Wheat entities in defending against the takeover attempts at issue in the above-mentioned civil litigation. Several of the Wheat investors and victims have executed declarations demonstrating their common interests with Mr. Touizer in defending the above-mentioned litigation. These declarations were executed weeks and months before the BOP attempted to thwart Mr. Touizer from communicating with them and took him back into custody. Four of these investors have also executed new declarations submitted herewith questioning the propriety of the BOP's behavior toward them and Mr. Touizer and explaining why they have been communicating with Mr. Touizer.

**C. BOP's Coercive Attempts to Modify the Criminal Judgment**

20. In late October 2020, officials at the Residentiary Reentry Program responsible for overseeing Mr. Touizer's home confinement verbally told Mr. Touizer for the first time that he was not permitted to communicate with individuals alleged to be victims in the criminal action. Mr. Touizer asked several questions in response to their efforts to restrict his communications.

21. On or about November 2, 2020, Respondent Mikulan, Director of the Residential Reentry Program, engaged in communications with Mr. Touizer, both by email and telephone, about the communication restriction.

Respondent Mikulan did not provide any written or oral explanation supporting or justifying the communication restriction.

21. On November 5, 2020, Respondent Mikulan emailed a document to Mr. Touizer on Salvation Army letterhead, demanding that Mr. Touizer sign it. The document recites certain conditions imposed by this Court on supervised release, but also adds a new restriction, *to wit*, that "[t]he defendant is prohibited from communication with any victims from his offense." *See*, Exhibit 4 to the Declaration of Daniel Touizer filed concurrently herewith ("Touizer Decl."); *compare*, Exhibit 1, Touizer Decl. (criminal judgment in S.D. Fla. Case No. 17-cr-60286-BB). Mr. Touizer responded that, before signing it, he still had several questions about the agreement. *See*, Touizer Decl. ¶ 9. He did not, however, refuse to abide by any lawfully imposed communication restriction and had already ceased communicating with the investors and victims associated with the Wheat entities. *Id.* at ¶ 13.

22. On or about November 6, 2020, Respondents instructed that Mr. Touizer appear at the Salvation Army on November 10, 2020 for a "meeting," which Mr. Touizer complied with. *See*, Touizer Decl. ¶ 12. Mr. Touizer believed that the meeting would be conducted to resolve his questions. *Id.*

23. While at the Salvation Army on November 10, 2020, BOP immediately converted the meeting into a "hearing" on the spot. *Id.* At this point, Mr. Touizer could not reasonably call any witnesses and still had never received any written (or even oral) reasons for the communication restriction

at the heart of the document Respondent Mukilan had sent him." *Id.* Mr. Touizer was also pressured into waiving his right to notice of at least 24 hours in advance of a disciplinary hearing, as required by BOP policy. *Id.*

24. The "hearing" consisted of Reentry Program officials asking Mr. Touizer to submit a written statement setting forth his position, which Mr. Touizer complied with, referring to his prior communications with Respondent Mikulan in which he explained both that he had questions about the extraordinary modification to the criminal judgment as well as his position that the modification would hurt his ability to defend himself in civil litigation and therefore violate important rights, and that the modification is inconsistent with BOP procedures. *Id.*, Exhibit 5. *See*, Touizer Decl. ¶ 12. Reentry Program officials next showed—but did not ever serve on Mr. Touizer for his retention—an incident report which stated as grounds for the report Mr. Touizer purported refusal to follow Halfway House directives. *Id.* According to Reentry Program officials, that report, along with Mr. Touizer's written statement, was submitted to BOP, and Mr. Touizer was asked to wait at the Halfway House for BOP's decision and instructions. Mr. Touizer was then—on the same day while awaiting BOP's decision—handcuffed and remanded to prison. *Id.* To this date, no written documentation has been provided to Mr. Touizer. *Id.* at ¶¶ 13-14.

25. On November 30, 2020, Mr. Touizer was finally permitted to speak with his case manager about having been precluded from submitting a

timely administrative appeal for reasons beyond his control. *Id*. The case manager, Ms. Garcia, stated to Mr. Touizer that the time to file an administrative appeal does commence running until Mr. Touizer is handed a copy of the report and other paperwork following the hearing, and that, because this has not occurred, no administrative appeal could be filed. *Id*.

26. It is undisputed that prisons and jails continue to be petri-dishes for COVID-19. Mr. Touizer is still at a high risk of suffering devastating consequences if infected with SARS-CoV-2. On December 4, 2020, the BOP reported that 18 inmates had tested positive for COVID-19. *See* Exhibit A attached. As of Friday December 18, 2020, The BOP's website reports that FDC-Miami has 15 inmates and 26 staff with active COVID-19 cases. *See* https://www.bop.gov/coronavirus/

**II. This Court Has the Authority to Order BOP to Release Mr. Touizer to Home Confinement**

27. A writ of *habeas corpus* pursuant to 28 U.S.C. § 2241 is a proper vehicle for granting the relief requested herein. Section 2241 authorizes courts to grant *habeas corpus* relief where, *inter alia*, a person "is in custody in violation of the Constitution . . . of the United States." 28 U.S.C. § 2241(c)(3). In addition to challenging Respondents' decisions in violation of the First Amendment rights of Mr. Touizer and third parties, Mr. Touizer alleges violations of his Fifth and Eighth Amendment rights.

28. District courts have broad equitable powers to remedy wrongs where government authorities "fail in their affirmative obligations." *Swann v.*

*Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15, 91 S. Ct. 1267, 1276 (1971); *see also*, *Procunier v. Martinez,* 416 U.S. 396, 405–406, 94 S. Ct. 1800, 1807–08 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989) ("When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights."); *Bing v. Roadway Exp., Inc.*, 485 F.2d 441, 448 (5th Cir. 1973) (noting that "the power of the district court to fashion an equitable remedy is broad."). An agency decision cannot be given "controlling weight" if it is "arbitrary, capricious, … manifestly contrary to the statute," or "not one that Congress would have sanctioned." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844-45 (1984). Furthermore, "[i]f … the court determines Congress has not directly addressed the precise question at issue, … the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*, at 843.

29. In reviewing a restriction imposed by BOP, courts apply the reasonableness test pursuant to the Supreme Court's instructions in *Turner v. Safley*, 482 U.S. 78, 89–90, 107 S. Ct. 2254, 2262 (1987), which depends on a consideration of whether: (1) a "valid, rational connection" exists between the regulation and the purported governmental interest; (2) alternative means of exercising a constitutional right remain available to a prisoner; (3) the accommodation of the right will have a significant impact on the prisoner's fellow inmates, prison staff or prison resources; and (4) ready alternatives to

the regulation exist that would not impinge on the prisoner's rights. *Id.*

## III. The Exhaustion Rule Does Not Apply

30. This is an extraordinary case where BOP officials impeded Mr. Touizer's ability file an administrative appeal because BOP has not served Mr. Touizer with an incident report or post-hearing report setting forth the grounds for the disciplinary action, and thus no administrative appeal is available. *See,* Touizer Decl. ¶ 14. Immediate review by this Court is proper because Mr. Touizer is challenging the constitutionality of the agency procedure itself, in which case the exhaustion rule does not apply as a matter of common sense. *See, e.g., Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1557 (11th Cir. 1985) (holding that "review procedures are inadequate because [petitioner] makes a constitutional attack on [the agency's] statutory scheme"). Under the circumstances, BOP could essentially refuse to serve a written incident report *in perpetuity* and could therefore forever preclude review of its arbitrary decision in violation of well-settled authorities.

31. It is further recognized, that although a petitioner must ordinarily exhaust available administrative remedies, exceptions to the exhaustion requirement exist, including "when resort to the administrative route is futile or the remedy inadequate." *Curry v. Contract Fabricators Inc. Profit Sharing Plan*, 891 F.2d 842, 846 (11th Cir.1990) (citation omitted). A district court's decision to deem the exhaustion rule inapplicable will only be "overturned on appeal only if the district court has clearly abused its

discretion." 891 F.2d at 846; *see also, e.g., Gibson v. Berryhill*, 411 U.S. 564, 564, 93 S. Ct. 1689, 1691 (1973) (holding that an administrative remedy may be inadequate where the administrative body is shown to be biased).

32. The circumstances of this case are extraordinary: Mr. Touizer "may suffer irreparable harm," i.e., by contracting of COVID-19 while imprisoned, "if unable to secure immediate judicial consideration of his claim." *McCarthy v. Madigan*, 503 U.S. 140, 147, 112 S. Ct. 1081, 1087 (1992). This is a case where "[t]he ordeal of having to go through the administrative appeal process may trigger a severe medical setback." *Bowen v. City of New York*, 476 U.S. 467, 483, 106 S.Ct. 2022 (1986), *see also, e.g., United States v. Milner*, 461 F. Supp. 3d 1328, 1332 (M.D. Ga. 2020) (applying this framework to petition to modify sentence due to COVID-19); *United States v. Delgado*, 457 F. Supp. 3d 85, 92 (D. Conn. 2020) (concluding that requiring petitioner to exhaust administrative remedies, given his unique circumstances and the exigency of a rapidly advancing [coronavirus] pandemic, would result in "undue prejudice" and render exhaustion of the full BOP administrative process both futile and inadequate); *United States v. Colvin*, 451 F. Supp. 3d 237, 239 (D. Conn. 2020) (same); *United States v. Zukerman*, 451 F. Supp. 3d 329, 331 (S.D.N.Y. 2020) (same); *United States v. Perez*, 451 F. Supp. 3d 288, 291 (S.D.N.Y. 2020) (same).[1]

---

[1] While this Court has held that general concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and compelling reasons, *United States v. Bueno-Sierra*, No. 93-CR-00567, 2020 WL

33. The Supreme Court has repeatedly held that the exhaustion rule "is not rigid and inflexible" and the "the failure to exhaust [administrative] remedies does not deprive an appellate court of jurisdiction to consider the merits of a habeas corpus application." *Granberry v. Greer,* 481 U.S. 129, 131, 136 (1987) (citing *Strickland v. Washington,* 466 U.S. 668, 684 (1984); *Rose v. Lundy,* 455 U.S. 509, 515–520 (1982); *Frisbie v. Collins,* 342 U.S. 519, 521–522 (1952)). Where petitioner's claim is of such importance that "the interests of comity and federalism will be better served by addressing the merits forthwith." *Granberry*, 481 U.S. at 134, 107 S. Ct. at 1675. And "[w]hen the Government is attempting to impose criminal sanctions on [the petitioner] … the interests underlying the exhaustion rule [must] clearly outweigh the severe burden imposed upon the [petitioner] if he is denied judicial review." *McKart v. United States*, 395 U.S. 185, 197 (1969); *see also, Mathews v. Eldridge*, 424 U.S. 319, 331 (1976) (finding that the constitutional importance of the petitioner's claim can render the available administrative remedies meaningless); *Reed v. Heckler*, 756 F.2d 779, 783 (10th Cir. 1985) (exhaustion requirement was deemed waived because claimants had "alleged acute mental and physical distress in the face of the proposed reductions of their benefits.");

2526501, at *5 (S.D. Fla. May 17, 2020) (Bloom, J.), the finding in *Bueno-Sierra* is distinguishable because BOP has *already determined* that Mr. Touizer is at serious risk of harm or death from contracting SARS-CoV-2 and should thus be placed in home confinement. The Court should admonish BOP officials that their authority does not extend to unduly pressuring a prisoner on home confinement to comply with any unreasonable demands or shed his constitutional rights out of fear of death if remanded to prison.

*Dudgeon v. Rios*, No. 0:19-CV-1489-SRN-DTS, 2019 WL 5418192, at *2 (D. Minn. Oct. 23, 2019) (excusing petitioner's failure to exhaust his administrative remedies because petitioner's claim was "time-sensitive and straightforward."). The extraordinary circumstances of this case render the exhaustion rule inadequate and justify immediate review by this Court.

**CLAIM I**

**Violation of the First Amendment Right to Freedom of Speech**

34. Petitioner repeats and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

35. The First Amendment guarantees individuals the right to freedom of speech. "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*,482 U.S. 78, 84, 107 S.Ct. 2254 (1987) (citation omitted); *see also*, *Martinez*, 416 U.S. at 422 ("A prisoner does not shed [his] basic First Amendment rights the prison gate.").

36. Petitioner and several third parties engaged in communications protected by the First Amendment.

37. Respondents violated the First Amendment rights of Petitioner by attempting to pressure Petitioner to sign a document acknowledging a communication restriction which violated his First Amendment rights.

38. Respondents violated Petitioner's First Amendment rights and retaliated against him by re-imprisoning Petitioner under the rationale that

Petitioner "refused" to sign a document which served as a communication restriction in violation of his First Amendment Rights.

39. Respondents presented to Petitioner no written explanation or evidence imperatively justifying Respondents' imposition of a communication restriction, which the district court did not include in its Judgement. Nor was Petitioner presented with an incident report justifying the communication restriction.

40. Respondents' actions, as alleged herein, also violate the First Amendment rights of third parties. The individuals who engaged in communications with Petitioner ratified the communications with Petitioner and allege that these communications are necessary to preserve their substantial rights in the pending civil litigation described at paragraph IB, *supra*. *See also*, Declarations of Joseph Passio, Edward Urbaniak, Harold Reisenfeld and Thomas Danasco, filed concurrently herewith.

41. The communication restriction imposed by Respondents is arbitrary and irrational and is not reasonably related to legitimate penological interests. In prohibiting Petitioner from communicating with similarly situated investors or others impacted by the ongoing litigation, Respondents do not advance legitimate goals of the correctional institution of the BOP in general. The restriction was not imposed in a neutral fashion, without regard to the content of the expression. The restriction was not imposed based on an incident report. If it had been, Respondents would have been required to tailor

the restriction, if appropriate, narrowly enough to reasonably achieve whatever goals they are attempting to further.

42. Respondents' actions in remanding Petitioner to prison constitute adverse action against Petitioner.

43. Respondents' actions were caused by Petitioner's exercise of his First Amendment rights.

44. Respondents' retaliatory actions against Petitioner would chill a person of ordinary firmness from exercising their First Amendment rights. Petitioner himself has been chilled from further exercising his First Amendment rights out of fear that Respondents will continue to retaliate against him in numerous ways, both actual and threatened, according to proof.

45. Petitioner has suffered, and continues to suffer, irreparable injury because of Respondents' actions and is entitled to injunctive relief to avoid further injury.

**CLAIM II**

**Violation of the Due Process Clause of the Fifth Amendment**

46. Petitioner repeats and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

47. The Due Process Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

48. Procedural due process requires that the government be

constrained before it acts in a way that deprives individuals of liberty interests protected under the Due Process Clause of the Fifth Amendment. Respondents violated their own procedural rules.

a. As to the communication restriction, BOP violated 28 C.F.R. § 540.15, which permits BOP to impose communication restrictions only if one of the categories of misconduct listed at 28 C.F.R. § 540.15(a) is at issue. Petitioner is not guilty of any such misconduct, and Respondents did not ever assert otherwise. BOP also violated 28 C.F.R. § 540.15(c), pursuant to which the Warden must provide the prisoner with written reasons for the restriction and afford the prisoner an opportunity to object thereto. Analogously, if BOP seeks to restrict a prisoner from communicating with victims of his offense in racketeering and drug cases while in their custody, BOP must first move the district court for permission in showing cause. *See*, 18 U.S.C.A. § 3582(e); *United States v. Sabatino*, No. 16-20519-CR, 2018 WL 10038800, at **1, 2 (S.D. Fla. Feb. 12, 2018); *see also, e.g., United States v. Sotelo*, 94 F.3d 1037, 1040 (7th Cir. 1996) (noting that, aside from 18 U.S.C.A. § 3582(e), ("no federal statute nor any provision of the United States Sentencing Guidelines authorizes a district court to restrict the communications of an inmate as part of his sentence for mailing threatening communications.").

b. As to the alleged failure to comply with Halfway House directives, BOP also violated Chapter 2, § 541.5, 541.7 and § 541.8 of BOP's Inmate

Discipline Program, a true and correct copy of which is attached hereto as Exhibit B. Section 541.5 provides that a prisoner may only be disciplined if he has committed any of the enumerated "prohibited acts." *Id.*, at Table 1. Petitioner has not committed any of these prohibited acts. Section 541.7(c) provides that the prisoner must "receive written notice of the charge(s) against [him] at least 24 hours before the DHO's hearing." *Id.* Because Petitioner was never presented with an incident report or written reasons for the communication restriction, Petitioner was deprived of a reasonable opportunity to contest the communication restriction, call witnesses, or even of the identity of any alleged accusers. Petitioner was coerced into signing a "waiver" of the 24-hour notice requirement, but, according to Section 541.7(c), a waiver does not absolve Respondents *from providing written reasons*. Any waiver is also constitutionally invalid because it was not voluntarily and intelligently entered. *See, e.g.*, *D. H. Overmyer Co. Inc., of Ohio v. Frick Co*., 405 U.S. 174, 187, 92 S. Ct. 775, 783 (1972). Section 541.8 provides for the right to a disciplinary hearing. Petitioner was told he would have a "meeting" at the Halfway House, given that Petitioner had questions about the restriction. That meeting was converted into a "hearing" without notice to Petitioner. Section 541.7(h) provides that the prisoner "receive a written copy of the DHO's decision following the hearing." Because Petitioner was never provided with a written copy of the decision or any

written reasons of any kind, he is precluded from appealing the decision with BOP. Petitioner's due process rights were violated under longstanding Supreme Court precedent that, "[a]t least a brief period of time after the notice, *no less than 24 hours*, should be allowed to the inmate to prepare for the appearance before the Adjustment Committee." *Wolff v. McDonnell*, 418 U.S. 539, 564, 94 S. Ct. 2963, 2979 (1974) (emphasis added). "We also hold that there must be a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action." *Id.*, at 564, 94 S. Ct. at 2979. "We are also of the opinion that the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Id.* at 566, 94 S. Ct. at 2979.

49. Respondents have deprived Petitioner of his liberty interest protected by the Fifth Amendment by remanding Petitioner to prison based on the concocted and untrue claim of disobedience with BOP authorities. Respondents failed to provide adequate notice to Petitioner, hold a hearing to determine the communication restriction, or present an explanation of any kind of the communication restriction. Respondents' shortcomings are not cured by the presentation of the document stating the communication restriction. Because Respondents apparently attempted to impose a communication restriction by way of the document, which required Petitioner's

signature," rather than an incident report based in any identifiable misconduct—a document that was ultimately not signed—it is not even clear whether BOP deems a communication restriction to have been properly issued at this point. Basic due process guarantees demand more than leaving questions concerning the First Amendment right of the prisoner and several affected parties unanswered.

50. By not providing a reasonable opportunity to protest the communication restriction, Respondents also violate the Fifth Amendment rights of the third parties whose First Amendment rights are adversely affected by the restriction. *See, e.g., Martinez*, 416 U.S. at 418–19, 94 S. Ct. at 1814 (holding that requiring the outside party to the communication "be given a reasonable opportunity to protest that decision … [is not] unduly burdensome").

51. Respondents also violated Petitioner's substantive due process rights. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis,* 533 U.S. 678, 690 (2001). Any deprivation of this fundamental liberty interest must be accompanied not only by adequate procedural protections, but also by a "sufficiently strong special justification" to outweigh the significant deprivation of liberty. *Id*. Respondents violated Petitioner's Fifth Amendment right by revoking his home confinement status and remanding him to prison because an alleged

refusal to sign the document Petitioner was presented with. Because Respondents failed to comply with the procedural safeguards of the foregoing rules, a communication restriction was never validly imposed in the first instance, the restriction is unenforceable, and Petitioner's unanswered inquiries into the restriction do not justify exposing Petitioner to physical harm or death.

52. Finally, because, as of the date of this filing, Respondents failed to serve Petitioner with a post-hearing report as required by § 541.8(h) of Chapter 5 of BOP's Inmate Discipline Program (Exhibit B), an administrative remedy is arguably indefinitely unavailable to Petitioner, all the while he is exposed to serious harm while housed in an environment BOP already determined is unsafe for Petitioner.

53. Petitioner has suffered, and continues to suffer, irreparable injury because of Respondents' actions and is entitled to injunctive relief to avoid further injury.

## CLAIM III

## Violation of Eighth Amendment Right to Be Free from Cruel and Unusual Punishment

54. Petitioner repeats and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

55. The Eighth Amendment prohibits the infliction of cruel and unusual punishment. *Robinson v. California*, 370 U.S. 660 (1962). Under that provision, prison officials "must provide humane conditions of confinement; …

and must take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*,511 U.S. 825, 832 (1994) (citation omitted).

56. Respondents knew of the excessive risk to Petitioner's health during the COVID-19 pandemic. Respondents knew that BOP had determined that Petitioner should spend the remainder of his sentence in home confinement because Petitioner's safety would be jeopardized during the pandemic if housed at a prison facility.

57. Respondents sought to coerce Petitioner into signing a document that would impose a communication restriction without due process by threatening to expose Petitioner to the risk of serious physical harm if Petitioner refused to sign the agreement. Respondents then coerced Petitioner into signing a "waiver" of the 24-hour notice requirement of Section 541.7(c) of BOP's Inmate Discipline Program, but, even if the waiver were constitutionally valid and enforceable, it would not absolve Respondents from providing written reasons for their decisions.

58. Respondents violated Petitioner's right to be free from cruel and unusual punishment by remanding him to prison in retaliation for his inquiries into Respondents' extraordinary demands.

59. Respondents' coercive actions present an "unreasonable risk of serious damage to his future health or safety." *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (citation omitted).

60. Remanding Petitioner to a detention facility does not serve a

legitimate penological interest.

61. In doing the foregoing acts, Respondents acted with deliberate indifference to Petitioner's safety and constitutional rights.

62. Petitioner has suffered, and continues to suffer, irreparable injury because of Respondents' actions and is entitled to injunctive relief to avoid further injury.

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner prays that this Court grant the following relief:

i. Issue a temporary restraining order and preliminary and permanent injunctive relief ordering Respondents to immediately release Petitioner to home confinement under conditions the Court deems proper.

ii. Issue an injunction ordering Respondents to rescind any communication restriction, to the extent Respondents deem any such restriction to have been properly imposed.

iii. Enter a judgment declaring that Respondents' detention of Petitioner is in violation of his First, Fifth and Eighth Amendment rights.

iv. Award Petitioner his costs and reasonable attorneys' fees in this action, including costs and fees recoverable under 28 U.S.C. § 2412, the Equal Access to Justice Act, and other applicable law; and

v. Grant any other and further relief that this Court may deem fit and proper.

**VERIFICATION PURSUANT TO 28 U.S.C. § 2242**

I am submitting this verification on behalf of Daniel Touizer, my brother, who provided me a power of attorney, as his attorney in fact. I have discussed with Daniel Touizer the events described in this Petition and have examined all documents referenced herein. On the basis of those discussions and upon my review of those documents, on information and belief, I hereby verify that the factual statements made in the attached Verified Writ of Habeas Corpus under 28 U.S.C. § 2241 are true and correct to the best of my knowledge.

Dated: December 18, 2020

Stephan Touizer

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December ____, 2020 I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify

that the foregoing document is being served on this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

**BELL ROSQUETE REYES ESTEBAN, PLLC**
999 Ponce De Leon Blvd., Suite 1120-PH
Coral Gables, Florida 33134
Telephone: (305) 570-1610
Facsimile: (305) 570-1599

By: */s/ Henry P. Bell*
Henry P. Bell, Esq.
Florida Bar No. 90689
HBell@brresq.com